**United States District Court**
For the Northern District of California

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>v.<br><br>DAVID JOHN CALDER and JAMIE NORMAN GREIMAN,<br><br>Defendants.<br>_____ / | No. CR 04-00138 WHA<br><br>**ORDER DENYING DEFENDANT GREIMAN'S (1) MOTION TO QUASH SEARCH WARRANTS AND (2) REQUEST TO GRANT EVIDENTIARY HEARING AND FINDING AS MOOT HIS MOTION TO DISCLOSE THE IDENTITY OF THE INFORMANT** |

**INTRODUCTION**

In this case involving trafficking in gamma hydroxybutyrate (GHB), an illegal sedative, defendant Jamie Norman Greiman moves to exclude evidence seized pursuant to search warrants and requests a hearing to determine if a DEA agent failed to disclose information that would have led to denial of the warrants. Mr. Greiman has failed to demonstrate that government agents violated the Fourth Amendment. He has not proved his allegations that the agent's information was stale or that he omitted information that would have eliminated probable cause. Mr. Greiman also has not proven his claims that the government violated his rights by conducting a search before the warrant was executed. The motion and request for a hearing are **DENIED**. Another motion, to disclose the identity of a confidential informant, is **MOOT** because the government disclosed the informant's identity and produced him for an interview with defense counsel.

## STATEMENT

Mr. Greiman allegedly sold GHB to an undercover San Francisco police officer going by the name "Tony." The officer was participating in a secret investigation into GHB trafficking. "Tony," however, blew his cover by allowing his true name to be used on a voicemail greeting. When Mr. Greiman called "Tony," he therefore discovered his true name. After an Internet search, Mr. Greiman learned, as he put it, that "Tony was a cop." Mr. Greiman then spoke to an associate who, unbeknownst to him, was a government informant. He told the informant about his discoveries. Mr. Greiman purportedly told the informant that, as a result, he preferred to communicate by Internet instant messenger, was halting receipt of gamma butryolactone (GBL), an ingredient used to make GHB, and was keeping a low profile. On February 19, 2004, the informant told Drug Enforcement Special Agent Michael Tolliver that Mr. Greiman had discovered the investigation (DEA, Report of Investigation, File No. R3-03-0122, Feb. 27, 2004; Opp., Exh. 2).

On March 25, 2004, Agent Tolliver submitted an affidavit to Magistrate Judge Bernard Zimmerman in support of the government's application for a warrant to search Mr. Greiman's apartment at 1025 Bush Street in San Francisco. The affidavit did not contain any information about Mr. Greiman's discovery of the undercover investigation or of his decision to lie low.

The affidavit described Agent Tolliver's three years' experience as a DEA agent and six years' prior experience as a police officer, including his participation in "at least 100 drug investigations." He then described why he believed there was probable cause to search Mr. Greiman's home for contraband and evidence. He qualified his affidavit by stating that it was "not intended to include each and every fact known and matter observed by me or known to the government" (Tolliver Aff. I, 1–2, (Mar. 25, 2004), Exh. A, Br.).

Agent Tolliver described four online orders by Mr. Greiman for sodium hydroxide and pH strips, both of which can be used in the manufacture of GHB.[1] These orders occurred August 26, September 1, September 6 and October 26, all in 2002. He made these orders using email accounts registered in his own name, and requested delivery to his apartment at 1025

---

[1] The alkalinity/acidity of a substance is measured using the pH (potential of hydrogen) scale.

2

1   Bush Street.  Agent Tolliver also stated that, on three different occasions, a DEA agent
2   delivered such materials to Greiman, each time meeting him at 1025 Bush Street.  These
3   deliveries occurred about a year after the online orders, on October 2, October 30 and
4   November 13, 2003.  The agent also alleged that, on November 6, 2003, Mr. Greiman walked
5   from 1025 Bush Street to a coffee house and completed the aforementioned GHB deal with
6   "Tony," the undercover officer.  On March 25, 2004, the landlord of 1025 Bush Street
7   purportedly told a DEA agent that Mr. Greiman was moving out at the end of that month.  All
8   this information also was presented to the magistrate judge (*id.* at 3–8).

9        Agent Tolliver then made a series of general statements about how traffickers in GHB
10  — and illegal drugs in general — operate their businesses.  He said they often keep in their
11  homes drugs, related supplies, drug-related records, cash from drug sales, money-laundering
12  evidence, financial documents and communications devices.  He also said that evidence of who
13  controls a particular property often is found on the premises (*id.* at 8–12).

14       Based on the Tolliver affidavit, Magistrate Judge Zimmerman issued a search warrant
15  on March 25.  It authorized a search of Mr. Greiman's apartment at 1025 Bush Street for GBL,
16  other controlled substances, drug-manufacturing and distribution paraphernalia, documents
17  about drug dealing, computers capable of containing drug-related records, currency derived
18  from drug sales, financial instruments purchased with drug-related income, records related to
19  assets purchased with drug income, firearms, documents establishing who controlled the
20  apartment and evidence that Mr. Greiman's worked with alleged co-conspirators (Search
21  Warrant for 1025 Bush St., Apt. #9 (N.D. Cal., Mar. 25, 2005); Tolliver Aff. I, Attachments A
22  & B, Br., Exh. A).

23       Five minutes before executing the warrant on March 26, 2004, a DEA agent entered Mr.
24  Greiman's apartment under the ruse that he was a potential tenant (Maes Decl.).  During the
25  search, agents seized Mr. Greiman's computer, a half-gallon of GHB, a GHB recipe, equipment
26  to make GHB and accounts of who owed Mr. Greiman money (Tolliver Aff. II at 8–9 (Apr. 5,
27  2004), Br., Exh. B).  Magistrate Judge James Larson issued a search warrant for the computer
28  based on largely the same information given in the original affidavit (Search Warrant for

3

1  computer (N.D. Cal., Apr. 5, 2004)).  On August 12, 2004, a grand jury indicted Mr. Greiman
2  on 314 drug-trafficking counts (Docket #21).

**ANALYSIS**

4   Mr. Greiman claims that the affidavits did not establish probable cause that contraband
5  or evidence of crime was in his apartment on March 25, 2004, when the warrant issued.  The
6  information was too out-of-date to support probable cause because, he claims, the affidavits
7  indicated that his last known criminal activity was on November 6, 2003 — four-and-a-half
8  months before the warrant issued.  He also argues that, because the affidavit showed that he was
9  scheduled to move out in, at most, six days, there was no probable cause to believe that he had
10 not already moved his belongings out of the apartment.[2]

11  A district court reviewing a search warrant is limited to deciding whether the issuing
12 judge had a substantial basis to believe probable cause existed.  The court can only reverse
13 clearly erroneous decisions.  Probable cause exists when, considering everything disclosed in
14 the supporting affidavits, there is a "fair probability" that evidence or contraband will be found
15 at the search location.  *United States v. Stanert*, 762 F.2d 775, 778–79 (9th Cir. 1985), *amended
16 at* 769 F.2d 1410 (9th Cir. 1985).  Evidence of drug dealing is likely to be found where the
17 dealer lives.  *United States v. Angulo-Lopez*, 791 F.2d 1394, 1399 (9th Cir. 1986).

18  Contrary to Mr. Greiman's assertions, there was probable cause to search the apartment
19 and the computer.  The original affidavit stated that Mr. Greiman had trafficked in GHB
20 beginning August 26, 2002, and that he had engaged in drug transactions several times through
21 November 13, 2003.  The affidavit thus suggested a long-term drug operation.  There was a
22 substantial basis to believe that some evidence of such a business would remain in the dealer's
23 apartment four-and-a-half months later, even if he stopped operations entirely after discovering
24 the undercover officer's true identity.  Indeed, Mr. Greiman's statements to the informant
25 support the inference that he had continued to hold evidence and engage in criminal conduct up
26 to that point.  Furthermore, as the affidavit asserted, drug dealers often maintain, over long

---

[2] Mr. Greiman has listed an incorrect date.  In fact, the last criminal activity alleged in the first affidavit was on November 13, 2003, when Mr. Greiman accepted delivery of GBL.  *See* 21 U.S.C. 802(34)(X) (listing GBL as controlled substance).

4

periods, accounts receivable, telephone numbers of business associates, records of goods and financial instruments purchased with drug proceeds, records of telephone calls to drug associates, cash from drug transactions, and communications devices containing drug-related data. The information that Mr. Greiman would soon move out likewise did not invalidate the conclusion that probable cause existed. It was a fair probability that Mr. Greiman would not vacate the apartment completely until March 31. In fact, the landlord told agents March 25 that Mr. Greiman intended "to move out . . . at the *end of the month*" (Tolliver Aff. I at 8–12 (emphasis added)). The magistrate judge was not clearly erroneous in issuing the warrant.

Mr. Greiman invokes *Durham v. United States*, 403 F.2d 190 (9th Cir. 1968), in support of his contention that the information was too stale to support probable cause. In *Durham*, the Ninth Circuit held that an affidavit did not support probable cause to search a man's house trailer on the basis of representations that (1) nine months earlier the subject of the search had passed a counterfeit bill and had sought to buy paper commonly used by counterfeiters, and (2) in the two calendar years preceding issuance of the search warrant in May 1965, the subject of the search had printed counterfeit notes while working with a man formerly convicted of counterfeiting. The affidavit made no representation indicating that the crime might be continuing. *Durham* noted that the lapse between the last criminal act alleged and issuance of the warrant was at least seventeen weeks. The Ninth Circuit held that the delay was too long for the affidavit to provide cause to believe that contraband or evidence still would be in the searched premises. It endorsed the notions that there was no decision upholding a search warrant issued more than thirty days after discovery of the evidence supporting it, and that a seven-weeks lapse invariably rendered the facts stale and the search warrant "nugatory." *Durham*, 403 F.2d at 192–93, 194 & n.6, 195 (citing *Schoeneman v. United States*, 317 F.2d 173, 177 (D.C. Cir. 1963) and Annotation, 100 A.L.R. 2d 525 (1965)).

*Durham* does not control the instant motion. *First*, unlike the *Durham* affidavit, the Tolliver affidavits stated why the evidence sought was likely to be present at defendant's address, irrespective of whether the drug dealing was continuing. *Second*, information that Mr. Greiman dealt drugs repeatedly over more than a year allows the fair inference that his drug

operation was continuing.  The *Durham* affidavit, by contrast, contained no basis for believing that the counterfeiting operation was continuing.  *Third*, to the extent *Durham* suggested that a delay of more than seven weeks always rendered information stale, it is no longer correct. Since *Durham*, longer intervals have been held not to negate probable cause.  *See, e.g.*, *United States v. Foster*, 711 F.2d 871, 878 (9th Cir. 1983) (three-month delay); *United States v. Reid*, 634 F.2d 469, 472–73 (9th Cir. 1980) (nine-month delay); *United States v. Greany*, 929 F.2d 523, 524–25 (9th Cir. 1991) (18-month to two-year delay).  *Fourth*, there can be no blanket rule setting a cut-off time after which all information on evidence and contraband goes stale.  In certain situations, evidence and contraband are likely to be moved or destroyed shortly.  In others, they will stay put for long periods.  *See United States v. Solario*, 577 F.2d 554, 555 (9th Cir. 1978) ("[T]he likelihood that the object will be moved, as well as the length of time since the event occurred, will determine whether probable cause exists.").  *Durham* acknowledged this when it stated:  "The length of the time lapse alone is not controlling since even a brief delay may preclude an inference of probable cause in some circumstances while in others a relatively long delay may not do so."  *Durham*,  403 F.2d at 194 n.6.  For example, evidence that a person was under the influence of an illegal drug might evanesce quickly as the body metabolizes the narcotic.  Evidence of drug dealing, by contrast, usually would endure longer. In the instant case, evidence of drug dealing was fairly likely to be held by Mr. Greiman in his apartment for four-and-a-half months after the most recent criminal act alleged in the affidavit, because such evidence included telephone records, computer data that was difficult to erase completely and records of who controlled the apartment and of uncollected drug debts.

\*            \*            \*

Mr. Greiman also contends that he is entitled to an evidentiary hearing to determine if the search warrants must be voided because Agent Tolliver failed to disclose material information that would have eviscerated probable cause for the search.

To merit an evidentiary hearing, a defendant must make a substantial preliminary showing that (1) the affidavit contained a false statement or material omission, (2) that this false

6

statement or material omission was made knowingly and intentionally, or with reckless disregard for the truth, and (3) that the falsity or omission is necessary to a finding of probable cause. *United States v. Reeves*, 210 F.3d 1041, 1044 (9th Cir. 2000).

Mr. Geiman alleges that Agent Tolliver made several material omissions, and that they were knowing and intentional or at least made with reckless disregard for the truth. The affidavit stated that the business from which Mr. Greiman purchased sodium hydroxide and pH strips sold those items and potassium hydroxide. Mr. Greiman notes that Agent Tolliver did not tell the magistrate judge that sodium hydroxide, potassium hydroxide and pH test strips are not illegal to sell or possess. Whether or not possession of a particular thing is illegal is a matter of law, not of fact. It therefore need not be included in an affidavit. Mr. Greiman also claims that it was a material omission not to disclose that Mr. Greiman had learned of "Tony's" true identify and therefore planned to halt acceptance of GBL and maintain a low profile. Mr. Greiman has not made a substantial preliminary showing that the omission of this information was necessary to the finding of probable cause. Even considering this information, there was probable cause to believe that the evidence and contraband would be found at Mr. Greiman's apartment. Although it diminished the likelihood that GBL would be found there, it did not diminish the strength of the inference that records and other evidence would remain in the apartment. Lying low did not require destruction of evidence. Furthermore, it suggested that Mr. Greiman continued his drug trade into February 2004. It thus served to bolster the conclusion that the information was not stale.

In a supplemental brief submitted after interview of the informant, Mr. Greiman suggested that facts revealed then support the instant motion. Those facts are (1) that, after the conversation on February 18, 2004, in which Mr. Greiman stated he would lay low, the government repeatedly tried to re-establish contact with him by telephone, to no avail, (2) that the undercover officer "Tony" made unsuccessful further attempts to buy GHB from Mr. Greiman, and (3) that the informant no longer recalled (at the time of the interview) whether Mr. Greiman had told him he was temporarily or permanently halting operations.

7

These facts do not help Mr. Greiman. A failure to reach a suspect by telephone does not suggest that he has removed all evidence and contraband from his home. The unsuccessful attempts to buy drugs may have indicated that Mr. Greiman was no longer actively selling drugs. It did not, however, eliminate probable cause to believe that his alleged prior dealing would not be evidenced by objects in his apartment. It is totally irrelevant to the probable-cause analysis whether or not the informant remembered, at the time of the interview, whether Mr. Greiman planned a temporary or permanent halt to operations. That fact did not exist at the time of the search warrant's issuance. It therefore could not have been material or disclosed, and could not have affected the magistrate judge's probable-cause determination.

For the preceding reasons, no evidentiary hearing is warranted on whether to void the warrants due to nondisclosure of information.

Mr. Greiman also claims that the government engaged in such an extraordinarily intrusive search that the evidence must be suppressed. This allegedly extraordinary conduct was that Agent Stephen Maes entered (and, according to the defense, thus searched) Mr. Greiman's residence under the false pretense of being a prospective tenant. He only cites two decisions in support of this argument that actually held a particular search or seizure unreasonable. They are *Moreno v. Baca*, 400 F.3d 1152 (9th Cir. 2005), *superceded by* 431 F.3d 633 (9th Cir. 2005), which invalidated the suspicionless search of a parolee, and *Tennessee v. Garner*, 471 U.S. 1 (1985), which held that police officers could not seize a person by shooting him as he fled the scene of a crime unless shooting was necessary to prevent a dangerous person from escaping.

Neither decision supports Mr. Greiman's argument. Unlike *Moreno*, the law-enforcement agent in the instant case had reasonable suspicion to search Mr. Greiman's apartment. Unlike *Garner*, there was no unreasonable seizure. Indeed, Magistrate Judge Zimmerman had already issued the search warrant based on a valid finding of probable cause. Although Agent Maes lied to gain Mr. Greiman's consent to enter, such deception is a lawful ruse to gain entry to a suspect's private residence. A law-enforcement officer may lie about his

8

identity in order to gain consent to enter a home, provided he or she does not then ransack the place. *See, e.g.*, *Hoffa v. United States*, 385 U.S. 293 (1966) (holding that defendant had no legitimate expectation of privacy when he admitted person into his hotel suite during discussion of illegal activity); *Lewis v. United States*, 385 U.S. 206, 206–07, 210 (1966) (holding that officer may lie about his identity to gain entry to a home, then testify at trial about what happened inside).

## CONCLUSION

There was probable cause at the time the search warrants were issued to believe that Mr. Greiman's apartment and computer contained contraband or evidence of crime. The information on the affidavit was not impermissibly stale. Mr. Greiman has not made a substantial showing that the omitted information was necessary to the finding of probable cause. There consequently is no reason to hold an evidentiary hearing on the validity of the affidavits. Finally, there was no extraordinary government conduct sufficient to merit suppression of the evidence. For these reasons, the motion and request for a hearing are **DENIED**. The motion to compel disclosure of the informant's identity is **MOOT**.

**IT IS SO ORDERED.**

Dated: March 2, 2006

WILLIAM ALSUP
UNITED STATES DISTRICT JUDGE

9